Judge Buckner
delivered the opinion of the court.
This was a suit in chancery, instituted by Bradberry & Fosters, merchants of Cincinnati, Ohio, against George C. Keas, in the Jefferson circuit, on the-29th day of October, 1828, to rescind a contract for the purchase of $'.,597 worth of; goods, wares and merchandize, sold by the complainants to Keas, on the 11th of October, 1828. The bill charges that Keas, being in embarrassed, doubtful circums-ances, and owing debts to an amount beyond his ability to meet, came to the store of :he complainants, and fraudulently represented himself to' them as a merchant of good standing and credi t, and of solvency, residing at Mount Pleasant, Indiana; that under a belief of the truth of those representations,they entered into the contract with him for the sale of the goods, and received fr m him his promissory note for the price, dated 11th October, 18.28, and payable three months after date; that on* the 14th of that month, the goods were scipped on hoard a steam boat for Louisville, consigned to Buchanan &. Starkey, merchants of Louisville, which they had received, and then had in possession.
It is further charged, that the representations of Keas' were false; that he was in very doubtful circumstances, if not entirely insolvent. Apprehending a total loss of the debt, they pray for an injunction against Buchanan and Starkey, (who are made defendants,) restraining them from parting with the possession of the goods until the further order of the court, and that, unless they are secured in the payment of the debt due to them, the contract may be rescinded, «fee.
The circuit court for Jefferson county commenced its fall session in the month of October. On the 19th of November, Jeremiah Keas, brother of George, filed a petition, claiming to have purchased the goods from his brother previous to the institution of this suit, and praying to be made a party, which was accordingly ordered ; and thereupon, the complainants filed an amend.-. *447 >d bill against him, alleging that the claim set up by bun was fraud ule ntiy insisted upon, to enable George C. ticas to evade the pursuit of some of his creditors, who were about to commence attachments,and "hereby seize (ho goods to secure the payments of t.eir demands. They allege, that Jereirfah knew when he made tue pretendid and fraudul mt pivchase of the goods, tuey were not paid for; that his brother was deeply involved in debt, and unable to comply with his engagements. They also pray, that the goods may be sold, and the proceeds held subject to the order ofthe court, which the court accordingly decreed. By the report ofthe auctioneer, it appears that they sold, after deductingcommissions and other expenses, for the sum of $851 90 cents. George C. Keas entered his appearance to the suit, but filed no answer. Jeremiah answered, denying the fraud, and insisting on the validity of his purchase. Rut his answer is, nevertheless, somewhat evasive, and when viewed in connexion with the proof in the cause, is very unsatisfactory. He says that he does not know, of his own knowledge, whether his brother had paid for the goods or not, as he had not given him any information on the subject; that his brother had informed him that he had purchased them of the complainants, and said if he would buy them, and make the payments which were subsequently agree-t upon, it would put it in his power, ns he thought, to pay all his just debts.
Jle slates his residence to he at Louisville, and that of George, in Indiana, and that he, consequently, knew very little of his business, except that his brother had ■informed him that he had made money since he embarked in the mercantile business, if he could collect the debts due to him; biit that neither he, nor any other person, had told him whether he was in embarrassed or prosperous circumstances. He says, that before lie made the purchase of George, Addison & '«áerl’ie, merchants of Louisville, had instituted a suit, the object of which was, to subject the goods to the payment of a debt, due by his brother, to them; and that he was bound to discharge tiiat debt,if teey succeeded ill establishing their claim, in speaking of the manner in which he paid his brother, he says that he paid $605, conveyed a tract of land at the price of $890; that he assumed the payment of about $‘208 to one Nealy, which lie had since paid in ca«h notes, and liad. *448 paid to others several smaller debts, which he mentions; all which, when added to the debt claimed by-Addison & Mérric, amount, as he says, to the sum of $1,439. He also states, that he undertook to pay the freight, charges, commissions, &.c>, from Cincinnati to Louisville, which, with the money paid, and debts assumed, would amount to a sum almost equal to the value of the goods.
Upon a hea'ing of the cause, the circuit court dismissed Pie bill of the complainants with costs, and they •have prosecuted an appeal from the decree.
Considering -'his answer as irue, and hones!ly made, 'a person reading it would be induced to believe, that Jeremiah Keas was altogeJier ignorant of the circumstances under -which his brother had purchased ¡he. goods, and that he was equally ignorant of his circumstances and standing, as a merchant. ?>ut the proof strongly negatives each of those conclusions.
A store had been kept at Mount Pleasant, Indiana, which ínreran - owned, and g ive George an interest in the protits for ui.- services in attending o it. He sub. - •-■.riooily sold out, and George continued the establish-i as solep.->pr¡et ¡r. The precise timeat which this ¡.-a doe- no! appear, but it was, we'presume, hut a -.me prev-ou.? to ;h j purchase from the appellants; ->c: brother of George and Jeremiah Keas, ■ h - c-'- .odtion was taken,says, that he. be-liwcs it was ¡■c • >• ,o that time. For, a considerable time before <. • e Ui-; p-irciiaso of the appellants, he was in such •' ■ -i ras-ied and evidently failing circumstances, that a ¡i in Louisv-dlc. wtiere the defendant, Jeremiah, re-r - :-,d, had tiled their bill against him, as an insolvent -J: !)¡or, and another person, who was supposed to be. 'indebled to him, to subject the debt in the hands of the latieiv. to !he pay ment of a debt due by George C. Keas to thorn; and in November, 1828, bat a few weeks after he bad made the purchase in wocinna i, he passed 'through Louisville with asm-ill drove ofhorses, for the southern market; was pursu id by hamberlain, a merchant, of whom, during that fall, he and purchased goods, and process was sued out against him as an ab-sconding debtor, and the money cade by t:ie she of the property, after some contest with another brother, who sat up o claim to it.
*449 In fine, the proof conclusively shows, that in the fail j¡>f 1828, and for some time before, he was considered as -in desperate circumstances, if not absolutely and his failure'to answer, as well as the proof in ’ cause,' exhibits him as an adventurous and reckless '■swindler. Whether Jeremiah should be considered in a more favorable point of view, remains to be considered. Although he states in his answer, that he did not know whether George C. Keas had paid for the goods purchased or not, as he had not given him any informátion on the subject, the proof shows thát he was (present when they were purchased; that he aided in the selection of some, and made selections of others, while ■George was engaged in another.part of the house, "and from his conduct and conversation, the appellants had reason' to believe that he was jointly interested with his brother in the.purchase, and were not undeceived, until the note for the price was prepared for signature. That under such circumstances, he should have been ignorant of the fact, that they were purchased mn a credit, is utterly incredible. George, in the presence of his brother, arid without contradiction from him, falsely represented himself to the appellants as a man in good circumstances, owning lands and slaves in Kentucky, and as having lately made a large shipment of tobacco and pork to New Orleans. In speaking of the pricesof articles, at the time of the purchase, Jeremiah -would observe, “ we must háve these at such a price, as it will be necessary to compete with other vendor^ of such goods at Mount Pleasant;” and also observed, that when the goods arrived there, they were to be divided between him and his brother. The contract between the appellees appears to have been entered into in Louisville, on the 25th of October, 1828, under very suspicious circumstances. They are detailed by a witness, whose deposition was taken on the part of Keas. He says, that Jeremiah Keas came into his (witness’) shop, and remarked, that he was about to .purchase some goods of ais brother George, and did not know whether he ought to do it or not. He then -called his brother from the opposite side of the street?, and told him that if he purchased the goods, he must receive, in part payment, some land, lying southwardly from Louisville. George made np objection, and the contract was concluded. About (§600 were then paid? *450 and George wrote a receipt on the invoice, with which, the other appellee being dissatisfied, erased it, and wrote another himself, which was tested by the gentleman in whose shop it was written, who was an utter stranger to George C. Keas; who, nevertheless, stated, in presence of ihe witness, that if he could make collections of money due to him for goods, sold in Indiana, ■he had made money by his mercantile employment.:
Buchanan & Staikey do not appear to have been notified of this sale by either of the appellees, nor is there the slightest proof of the páyment of any part of the consideration, except the sum named as paid at the time, and about $10 subsequently assumed by Jeremiah, to be paid to one of the creditors of his brother, in Louisville; and that a conveyance was made by him to George, for some land, in Logan,- at the price of $300. Whether he had any valid title to it himself, or even possession of it, is not shown.- That Jeremiah Keas, who was, but a short time before the purchase in Cincinnati, ihe owner of the store at Mount Pleasant, in which his brother .was a clerk, receiving a part of the profits, if any there -were, for his services, should have been entirely ignorant of his pecuniary circumstances, when they were so notorious in the town in which that store had been kepi, as well as at Louisville, where he, Jeremiah, resided, cannot be believed. That he made mo particular inquiries of his brother, as to his situation, is very probable, for his connexion with him in business, had afforded him ample opportunities of knowing all about it. A part of his answer, as to his ignorance, whether the goods had been paid for or not, is postively disproved; and he who is thus convicted' of falsehood in-one particular, deserves no credit as to the remainder of his answer. Why did he not prove the various assumpsits, which he alleges he made to the creditors of his brother? Why undertake to him, to pay the debt of Merrie and Addison, without informing them of it, and that upon condition only that they established their claim? It is not pretended that their claim was unjust. Why, avoiding the house of the consignees where the goods were, did they seek the shop of a man who was an entire stranger to one of them, ' and alter exercising such particularity and caution as to have a second receipt written, under an apprehension *451 that the first did not sufficiently secure them against the danger of detection, take care to let the witness understand that George had succeeded well in his business in Indiana? -But it is deemed unnecessary to extend the argument upon mere matters of fact. We have given the prominent features of the transaction, and shall only observe, that they carry with them marks of fraud which cannot be easily mistaken, and that the contract ought,therefore, to be rescinded. Fraud will not be sumed in the absence of proof, nor upon slig’it proof; but, like any other fact, it may be established by circumstantial testimony.
Where an inresentin/wm' self .to be a merchant ot ^ solvency^ succeeds in making a pur-tf is a 7™“'/, and loAviiítm’ that ground, rescrn* the COflCldCtm

to person' w’lib^^'d ed.

Duncan and T. Crittenden, for appellants; Mcholas, Semple and Monroe, for appellees.
As to the jurisdiction of the court, it cannot be doubted. Buchanan & Starkey, who had the goods in possession, were residents of the circuit in which the suit was .prosecuted, as was one of the appellees.
Where the other resided, does not appear, except that he was a citizen of this state, and ought, upon proper cases contracts in relation to personal, erty, is 'too well settled to be now ijut:suuneu. this is such a case, we feel well satisfied.
The decree of the circuit court must be reversed, and the cause remanded, that a decree may be entered, in accordance with this opinion.
■ Brown, as counsel for the appellees, presented the ‘ following petition for arc-hearing.
In this case, your petitioners, who were not of counsel for either party at its trial, but bound, on examinalion of the record and opinion, to present a petition for a re-hearing. If the anxiety by the party, Jeremiah Keas, needed any apology for wishing a re-hearing, it would be found in the wreck of character, more than loss of estate, which results from the written opinion of the court. This is much heightened by a circumstance in his favor, of which he c.annot avail himself in this court. It is the following:
It will be seen by the record, the papers were submitted to the court below, and- not read and succeeded by argument, and they, of course, are often handed to *452 the court without any suspicion of the court, that any' thing was there, which ought not to be theres The party is, therefore,- much surprised at finding a depo* sition there, purporting to be given by a man, whom, he insists, he never saw, proving him to be at a place at which he never was, and that,,wholly without notice; for, although a notice was filed with it, it was never served,as will appear by a copy thereof, with the clerk’s certificate thereon, accompanying-this petition.
We are too well awareof the rules of this court, to exhibit this, as supposingit would, or ought to have, any effect on this court, in deciding on the petition for re-hearing, but shall take the record as-it is.
It is disagreeable to . require a court to re-consider questions of fáct; -although we do not conceive, that there is no ground’to suppose that the opinion on this. "Question needs no revision. We- solicit the court to read the record, leaving, out the deposition of Bainbridge, and then to say whether there is- any thing to rebut the fiat denial of the answer of J. Keas. If there-be not, then the force of the rule applies, that requires two depositions to disprove the answer in all its force, and has not been enough regarded in the opinion rendered. The court relies on some other circumstance to rebut the answer. But there is one powerful circumstance rebutting the deposition of Bainbridge itself, and that is, the bill itself never alleged or hinted the facts, which Bainbridge proves. When J. Keas came into the cause, and the complainants were compelled to make him a defendant, because he asserted title to the goods by purchase from G. Keas, was - any thing more natural than to have charged J; Keas with being a party to, and privy in, the fraud said to be committed in the purchase of the goods? The bill, or rather amended bill, is particular to connect J. Keas with G. Keas, by alleging him to be a brother, and if other circumstances of'connexion had existed, they would have been told. How natural was it to have-told and charged him, in the style of- Bainbridge, with being-present at the purchase of the-goods, with taking an active part in it, and selecting goods, and hearing his brother rep resent himself as solvent, and with aiding in the deception of getting- away the goods? But, strange to tell, there is not one word of, this. To read *453 the bill, and amended bill, you could not suppose that the complainants had ever seen J. Keas. They charge expressly that G. Keas made the purchase alone. How can such silence be accounted for? It was the most complete trap for J. Keas in which he could have been caught. It does leave a most forcible inference to be drawn, that J. Keas never had any thing to do with the purchase at Cincinnati, and the complainants’ own pleadings do lay the deposition of Bain-bridge under strong suspicion; so strong, that it will not bear the character of one positive and credible deposition, which can be corroborated by circumstances.
The court assumes the fact to be, that J. Keas then resided in Louisville. This is asserted in complainants* brief; but I find it not in the record. The proof is wholly silent about his residence. He says in his answer, he Jived in the circuit, which .corresponds with the fact, for he lived in Jefferson county, a considerable distance from the city of Louisville, and there he might live, and be wholly ignorant of the rumors of embarrassments of G. Keas, which is supposed to have been afloat in Louisville, as any one knows, who knows the county. Besides, what rumors were afloat about George’s embarrassments at and before the date of the purchase- from the complainants ? Simply, then, one or two houses had trusted him for goods,and had presented their accounts for payment, and not received it; and this is every thing we find in the record. Yet the court supposes his embarrassments were notorious in Louisville, and that Jeremiah was there to hear and know the whole! Moreover, the court supposes that he had a bad character for punctuality in Mount Pleasant, Indiana, and that J eremiah must have known it. If there is one word about the character of George Keas, in Mount Pleasant, in the record, we are unable to find it. A dedimus was granted the complainants to take depositions there,, and they gave notice to do so, and Jeremiah attended, and they took none, and Jeremiah recovered of them, under the act of assembly, his mileage and fine for their non-attendance; and there is not a deposition from Mount Pleasant, nor one deposition which speaks of his character, at Mount Pleasant.
Again, the court infers from the deposition of William Keas, that Jeremiah must have known all about *454 George at Mount Pleasant; and infers, that because .W. Keas (the brother,) says that the time when George acted as clerk there for Jeremiah, he believes, was before the purchase from the complainants, that it was but a little while before; not observing that the same witness tells, that Jeremiah sold out his stock of goods there, not to George, and that-George then acquired a stock of his own, and went into merchandize on his own footing, and that this happened some time before the sale by complainants, not saying how long, for he (the witness,) lived one hundred and forty miles south of Louisville, and took the facts from information, and did not pretend to be accurate. Yet the court infers all to have been done in a breath, when years may have intervened. . . . '
The court seems to find many defects in the appel-lee’s proof as made, and more in what he did not make, to condemn him. The court thinks strange they shoud conclude the bargain at Weatherford’s shop, a stranger to George, and not at Buchanan & Starkey’s warehouse. Who was Weatherford? How near to, or far off, from the warehouse of Buchanan & Starkey? Is it at all unusual or surprising, that a countryman, without a home in the city, should use the shop of an acquaintance, in which to do his business, or make his purchases?
But the particularity of the two brothers is relied on. If this must destroy a contract, a loose dealing in conversation is enough to destroy it, and thus no dealing between brothers can stand. If it is loose and wants evidence, it is a sham; if particular, it falls for particularity, and, getting evidence of it, makes it an object of suspicion. But, with due submission, it does not partake of more particularity than might be expected. A receipt on the invoice, to entitle the appellee (Jeremiah,) to the goods, and produce a transfer on the books of the warehouse, and a conveyance of the land, was all that was committed to writing; the rest was done by assumpsits and promises, and no formal delivery at the warehouse was made.. This, however, we will show presently was wholly unnecessary, for the possession of Buchanan «fc S a-key was the-possession of George Keas, and a delivery of the invoice, with an acknowledgment of the right, was a delivery to Jeremiah* *455 and authorized him to bring his action of detinue for them, as there was no adverse possession; but, we will refer this to the law of the case. If the parties had went to the house of the bailees, (for they are no more,) Buchanan & Starkey, and there formally have paid the money, and had a foi mal change of the possession, there would have been more ground to have accused the parties of fraudulent partícula- ity. Because they did not do so, they are condemned; and, also, because they omitted to do so! We cannot see any thing suspicious, in a visitant io a city, going into the shop of an acquaintance to close a bargain of this sort and of this magnitude.
But the court has relied on Jeremiah, not proving every payment. We do insist that it was not necessary. The bargain and partial payment, was enough to vest the title and carry the possession, where there was no adverse possession. Nay, according to the common law, as laid down by. Blackstone, the title passes at closing the contract, without the payment of a cent.
The proof is clear, that the ,§605 was paid. The parties went off together, and where did they go ? To the office of a lawyer to draw a deed for the land, and from thence to. the clerk’s office, that it might be acknowledged. For the court will iind, that the date of the deed and its acknowledgment, concurs precisely with the date of the receipt, and those dates are each proved to be trae. Now we here see mutual dealing on the same day, and the writings the same day. The inference then, is clear, that one is the consideration of the other; see Aldridge vs. Miller, &c. VII Monroe.
The court further seems to doubt, whether he had land! It is the iirst time we have seen title required, when not demanded. It is- proved that the father-owned a tract, of- land on Green river, and only one; .that he died, leaving ten or eleven children, among whom, it is to be, and is not yet divided; and it is proved that the father purchased, and from whom; and that Jeremiah conveyed to George Keas his undivided interest forthreehundred dollars,and the deed was acknowledge ed in Jefferson, and in due time recorded in the proper-county. This is proved by a coparcener in the land, *456 and the deed itself is produced, exactly corresponding with this statement. Is it possible that more can be required than tins, even if it was a bill to rescind a contract for land?
But we will now attend to the law of the case. The-bill goes on the ground, t ¡at George Keas defrauded the complainants by untrue representations of solvency; and agamst Jeremiah, noton the ground that he knew or participated in the fraud, but -.hat he knew that the goods were not paid for, and that ne made a fraudulent contract with his brother. ¡>y an imperious rule they were bound to tnose points in proof. But they left those grounds, and attempt to prove that Jeremiah was partía.ps criminis,.in the contract between tnemselves and George, and not in the contract between George and Jeremiah. On this ground also, the court decrees on the same proof. Now proof without allegation, is the same as allegation without proof.
The court, as well as the counsel, lay stress on Jeremía h knowing that the goods were nolpaidfor. It was necessary for him to know more, and the complainants do not charge him with defrauding them in George ¡Ceas’ contract. But suppose the goods are not paid for, and he knew it, what then? does it make any difference? Not the least. The allegation is immaterial, wholly so. Would the court, establish the position, that a merchant cannot acquire an unimpeachable title to goods, in the sale between merchant and merchant, unless they are paid for? and is it true, that the customers of a merchant,do not acquire title to his goods, when they purchase, provided he has committed a fraud in his purchase, and has not paid for them, when they know he has not paid for them? It behooves a purchaser of lands, when he knows his vendor has not paid for it, to inquire into a lien thereon; but not so as to goods. No lien exists on chattels after their delivery, wnettier the sale be fraudulent or not. The only lien is lost after their delivery to the vendee, or to some person for him, and is lost former afterwards. No right of stoppage in transitu, and no lien exists after delivery, and these goods were delivered at the river, and shipped by George Keas to his own consignees, to the commission merchants, Buchanan & Starkey. Now no lien followed them, paid, for or not paid¿far; *457 21 Kent’s Commentaries, 427 and sequel; and Ford Warren vs. Sproule, &c. II Marshall, 523. The latter is a case in the teeth of the present decision. The ■court seems to think that the power of the court to scind such a contract is clear. Clear or not clear, this is about the first case; see II Kent’s Commentaries,re 403, which is in point. Even in rescinding contracts in the sale of horses and slaves, courts of law as well as equity, strictly have held the party wishing to rescind, even for fraud, to a tender of restoration and demand of rescisión. Here, however, in a matter affecting mercantile law, the" court has allowed the complainants to rescind, without tendering to<George Keas his note, and demanding a restoration of the goods. Can a parallel case be found? In the mean time, the court has permitted the goods to be sacrificed, and instead of rescinding the contract, and placing the parties in statu quo, which alone can be done, the court below, on the prayer of the complainants, has sold the goods and.given the money back,-and this court has approved it, and permitted the complainants to insist on the contract, and sue George Keas for the balance.
Again, the court has laid stress -on tfie want of notice to JBuchanan & Starkey, of the sale from George to Jeremiah, and the want of delivery of possession. Who were Buchanan <fe ‘Starkey? They were mere bailees, the agents of George Keas. Their possession was his, and their possession was the possession of Jeremiah; and, it was wholly unnecessary to bring the goods to the corporal touch or formal delivery in such situation. The delivery of the invoice, or warehouse ..receipt, or other voucher of title, was a delivery of •possession. Such is the law as laid down by Roberts, in his treatise on fraudulent conveyances; and the case of Ford & Warren vs. Sproule, above cited, is in point.
Wherefore, a re-consideration is respectfully solicited.

Judge Buckner delivered the following response of the court to the petition for a re-hearing.

Upon a re-examination of the record, in this case, we have not perceived any reason, considering either the facts of the case, or the law' applicable to it, *458 which renders it proper to change the opinion deliv*. ered, in any respect whatever. It may be true, that Jeremiah Keas resided in the county of Jefferson, and notin Louisville; although, a person reading his answer, might readily come to the conclusion, that his residence .was in the city. Be that as it may, it cannot change the aspect of the case. The petitioners Seen» to suppose, that there is a fatal variance between the allegations and the proof, because Jeremiah Keas is not charged in the bill, with having participated in the fraud practised by his brother in the purchase of the goods. It is not necessary that it should have been so charged., If George G. Keas practised such a fraud, as would justify a rescission of the contract; and if the claim set up by Jeremiah, was feigned and fraudulently asserted, with the intention of preventing the appellants and creditors of George, from successfully asserting their rights, the grounds for rescission would be asolear, as if Jeremiah’s claim were out of the question. The case of Ford and Warren vs. Sproule, Armstrong, &c. referred to, as reported in II Mar. 523, is unlike this case; the appellants do not rely so much on any lien, which they claim, depending on the insolvency of G. C. Keas, as on the fraud practised in procuring the contract. As to the jurisdiction of a court of chancery, to rescind a contract in relation to personal property, on the ground of fraud, we again say, there can be no doubt. It has been so decided again and again; see the case of Hardwick vs. Forbes’ administrator, I Bibb, 213; and that of White vs. Clark, &c. III Monroe, 390. Various other cases might be cited, if necessary.
That-llm chancellor has jurisdiction to rescind a contract in relation to persona] property, on the ground of fraud, there is no doubt.
A contract in relation to personal property y/ill not be rescinded, on the ground of fraud, with out an offer to restore the money or property, received by virtue of the com tract.
In such a. case, where any part of the price agreed upon, has been received, the contract ought not to be rescinded, without an offer to restore the money or property received. But in this case, not a cent seems to have been paid. George C« Keas, is said to have lived in the stale of Kentucky, but where,' is not shewn. To have delivered his bond might have been impracticable. The bill to rescind, was a sufficient offer to restore the note; the decree rescinding the contract, will of course, direct a delivery and cancelklion of it. We did not look upon it as necessary to point out the terms of the decree for rescission at *459 length. The’note should surely be exhibited in court and cancelled; and the proceeds only of the sale of the goods decreed to the appellants, as they were sold at their instance; although the order on that subject, allowed Jeremiah to receive them, on his entering into bond with surety, conditioned to perform such decree as the court might render, so far as their value might extend, which he declined.
The petition for a re-hearing is overruled.